*A E*

**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

*CERTIFIED COPY*

# United States Court of Appeals

### For the Seventh Circuit
### Chicago, Illinois 60604

Argued August 8, 2006
Decided October 13, 2006

CERTIFIED COPY
A True Copy:
Teste:

Clerk of the United States
Court of Appeals for the
Seventh Circuit.

**Before**

Hon. DANIEL A. MANION, *Circuit Judge*

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 05-4453

UNITED STATES OF AMERICA,
 *Plaintiff-Appellee,*

 *v.*

OLUKOREDE OSIDEKO,
 *Defendant-Appellant.*

Appeal from the United States District
Court for the Northern District of
Illinois, Eastern Division.

No. 04 CR 905

Matthew F. Kennelly,
*Judge.*

**FILED**

NOV 0 6 2006

MICHAEL W. DOBBINS
CLERK U S DISTRICT COURT

## O R D E R

 Olukorede Osideko was carrying twenty-eight pounds of heroin hidden in a rice sack in his luggage when he arrived at O'Hare International Airport in Chicago, Illinois. He was charged with possession with intent to distribute heroin and importation of heroin. *See* 21 U.S.C. §§ 841(a), 952(a), 960(a)(1). Osideko's defense at trial was that he did not know the heroin was in the rice sack because his aunt packed it for him. The jury found him guilty, and he moved for a judgment of acquittal on the ground that the evidence was insufficient to sustain the jury's verdict. The district court denied the motion. We now affirm.

 When Osideko's flight arrived in Chicago from Lagos, Nigeria, he approached a security checkpoint with three softside suitcases. An officer with U.S. Customs and Border Protection who was stationed at the checkpoint asked Osideko what

part of Nigeria he was from. The officer found Osideko's response "awkward" and consequently referred him to a secondary security checkpoint to have his luggage examined.

Working at the secondary checkpoint was another CBP officer, Cynthia Herrera, who testified for the government. She asked Osideko for his customs form number 6059, which is how travelers declare whether they are bringing certain items such as food or livestock into the country. Osideko had not declared any food on the form, but when Herrera asked him whether he had any, he admitted that he had some fish. Herrera testified that she took the form and wrote "fish" on it. She then began to inspect his luggage and found some nuts, so she asked him whether he had any more food. He said, "Yes, gari," (which he described as derived from the casaba tree and similar to grits) and upon Herrera's instruction he wrote "gari" on the form.

Herrera asked Osideko to place his three suitcases on a nearby conveyer belt for inspection. She testified that he placed only two of the three bags on the belt. She then asked him whether all three suitcases were his, whether he packed them himself, and whether everything inside belonged to him. He answered "yes" to all three questions. She finished her inspection of the first two suitcases and then turned her attention to the third, which Osideko hesitated in putting on the belt. It weighed about forty pounds and had a rice sack inside. Herrera testified that she felt the bottom of the third suitcase and realized it was thicker than the other two even though they were the same style. An x-ray showed density in the bottom of the suitcase, and while Herrera did not tear it open, she thought it was reinforced with plywood.

The x-ray also showed that inside the rice sack was a small circle and "little circles all around it." Herrera decided to inspect the sack to find out what the circles were. When she opened it, she found several smoked fish. The fish had been placed in the sack without wrapping or packaging. Next she found a plastic bag containing mothballs, powdered red pepper, and a second plastic bag holding multiple packages of a "whitish brownish powder." The individual packages were marked with different letters.

The whitish-brownish powder tested positive for heroin. A chemist with the Drug Enforcement Administration testified that the heroin weighed 12.74 kilograms, or over 28 pounds, and had a purity of 78 percent. She also testified that this heroin emitted a strong vinegary smell.

The government called Immigration and Customs Enforcement Special Agent James Stewart as its expert witness on heroin importation and distribution. Agent Stewart testified that heroin in transit is often surrounded by mothballs, car oil,

mustard, or foods that will mask the vinegary smell of heroin. The packaging of heroin in multiple bags and containers is done, Agent Stewart explained, to simplify the distribution process. The letters or numbers on the bags indicate to whom the particular bag of heroin will be distributed once it reaches the United States. Agent Stewart also testified that the wholesale price of one kilogram of heroin in the United States is between $90,000 to $120,000. He stated that the average street-level purity of heroin at the time Osideko was carrying the drugs was between 7 and 25 percent and that's because drug dealers add "various cutting agents" to dilute the heroin. Agent Stewart hypothesized that one kilogram of heroin could be "cut" and resold as three kilograms with a lower purity.

Osideko testified in his defense. He maintained that he genuinely did not know he had heroin in his suitcase and that it must have been placed there by his aunt who supplied him with the rice sack. Osideko testified that, although prior to this trip he had not spoken to his aunt for seven or eight years because of a dispute over property, he saw her just before he left Nigeria, and she offered to buy him some food to bring back to the United States. He asked her to buy gari, fish, melon seed, and yam flour. When she brought him the rice sack, he felt the fish on the top but did not look inside the bag and stowed it directly in his luggage. He testified that usually when he brought fish back from Nigeria they were wrapped in some kind of packaging.

Osideko, a United States citizen, also testified about his familiarity with the customs process because he had traveled to Nigeria about twice a year for the last five years. He knew, he said, that his luggage was always searched when he declared food on his customs form, and even sometimes when he did not. He testified that he wrote "gari" on the customs form before he arrived at the security checkpoint, and that he did not include all the other food he thought he had because he figured noting gari was "good enough for them to search the bag." Osideko also confirmed that he told Herrera he packed his own suitcases.

The jury found Osideko guilty on both counts. He moved for a judgment of acquittal, which the district court denied. He was sentenced to 180 months' imprisonment and five years' supervised release on each count to run concurrently.

On appeal Osideko argues that the government did not present sufficient evidence at trial to establish that he knew there was heroin in his luggage. But rather than pointing to an evidentiary hole in the government's case, Osideko's position essentially is that his evidence was stronger and more believable than the government's. For example, he asserts that his testimony denying knowledge of the heroin "undermined any government inferences as to his knowledge." But as even Osideko recognizes, we do not reweigh evidence or assess the credibility of the witnesses. *See United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003); *United*

*States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999). An argument that the government failed to prove its case because there was conflicting evidence about Osideko's knowledge is preposterous. *See United States v. Hoogenboom*, 209 F.3d 665, 670 (7th Cir. 2000). And Osideko's attempts in his brief on appeal to explain his suspicious behavior at the airport are arguments more appropriately made to a jury than to this court. *See United States v. Van Wyhe*, 965 F.2d 528, 531 (7th Cir. 1992).

Regardless, the evidence at trial easily established that Osideko knew he was carrying heroin. A challenge to the sufficiency of the evidence is a formidable task given the rigorous standard of review. *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003); *United States v. Seawood*, 172 F.3d 986, 988 (7th Cir. 1999). In reviewing a claim of insufficient evidence, we draw all inferences in favor of the prosecution and will affirm if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Hicks*, 368 F.3d 801, 804-05 (7th Cir. 2004); *United States v. Hachs*, 162 F.3d 937, 942 (7th Cir. 1998). "Knowledge" is an element of both the possession and importation offenses. *See* 21 U.S.C. §§ 841(a), 952(a), 960(a)(1). Here, a rational juror could conclude that Osideko knew about the heroin in his luggage based on his suspicious interactions with the checkpoint officers, his admission to Officer Herrera that he packed his own luggage, his failure to declare certain food on his customs declaration form despite being a frequent international traveler, his attempt to avoid having the suitcase containing the heroin x-rayed, the reinforced plywood bottom of that suitcase, the unconventional way the food was packed in the rice sack, the sheer volume and value of the heroin, and his explanation for the presence of the heroin.

AFFIRMED.